19-mj-1224-DLC<br>
19-mj-1225-DLC<br>
19-mj-1226-DLC

## <u>AFFIDAVIT OF MICHAEL A. LOGAN</u>

I, Michael A. Logan, being sworn, state:

## <u>INTRODUCTION</u>

1.      I am a Police Officer with the North Andover Police Department.  I have been a North Andover Police Officer since February 2015.  I am currently assigned as a Task Force Officer ("TFO") to the Drug Enforcement Administration Cross Border Initiative ("DEA/CBI") and have been so employed since July 2018.

2.      I have received training in the investigation of controlled substances from the Methuen Police Academy at Northern Essex Community College in Haverhill, Massachusetts and completed the DEA Basic Narcotics School. I have been involved in numerous drug arrests and investigations of drug trafficking organizations. These investigations involved but were not limited to the following controlled substances: heroin, fentanyl, and cocaine. During these drug investigations, I have observed hand-to-hand drug transactions, observed numerous controlled substances, and am familiar with the ways illicit substances are packaged for distribution. I have also received annual training at the North Andover Police Department in-service program.

3.      In the course of my official duties as a police officer and TFO, I have interviewed many defendants, informants, and suspects who were users, sellers and distributors of controlled substances.  On the basis of my training and experience, I am familiar with the vernacular used by illegal drug users and distributors.  I am acquainted with the methods by which such persons seek to disguise the subject of their conversations and operations, and I am familiar with the full range of methods, practices and techniques by which members of organized conspiracies illicitly transport and distribute controlled substances.

4.      As a DEA TFO, I am authorized to investigate violations of the laws of the United

States, including violations of the federal drug laws in Title 21 of the United States Code.  I am a

"federal law enforcement officer" as defined by Federal Rule of Criminal Procedure 41(a)(2)(C),

that is, a government agent engaged in enforcing the criminal laws and duly authorized by the

Attorney General to request a search warrant.

### PURPOSE OF AFFIDAVIT

5.      I am submitting this affidavit in support of:

    a.   A criminal complaint charging Milton Elias LARA, a/k/a Abner Rosado,

        a/k/a Juan Arias Soto, a/k/a Jamie Espinoza, a/k/a "Maestro," with

        distribution of and possession with intent to distribute 40 grams or more of

        fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vi), on

        July 2, 2019, further described below.

    b.   An application for the issuance of a search warrant for 601 Lowell Street,

        Unit #6, Methuen, Massachusetts 01844 ("Target Location #1").  Based

        on the investigation, Target Location #1 is LARA's residence.  A

        complete description of Target Location #1 is set forth in Attachment A,

        which is attached hereto and incorporated herein.

    c.   An application for the issuance of a search warrant for 631 Haverhill

        Street, Basement, Lawrence, Massachusetts 01841 ("Target Location #2").

        A complete description of Target Location #2 is set forth in Attachment B,

        which is attached hereto and incorporated herein.

6.      In summary, between May 8, 2019 and July 2, 2019, Milton Elias LARA, a/k/a

Abner Rosado, a/k/a Juan Arias Soto, a/k/a Jamie Espinoza, a/k/a "Maestro," sold suspected

fentanyl to an undercover police officer ("UC") on five occasions.  On June 13, 2019, investigators observed LARA leave Target Location #1 and stop briefly at Target Location #2 prior to meeting with the UC to sell fentanyl. After this controlled purchase, LARA returned to Target Location #1. Further, on two other occasions, investigators observed LARA stop briefly at Target Location #2 prior to meeting with the UC to sell fentanyl. Still further, on another occasion, investigators observed LARA return to Target Location #2 after meeting with the UC to sell fentanyl.  Surveillance officers have observed LARA driving a vehicle registered at Target Location #1, and this vehicle has been observed parked outside both Target Locations on several occasions.

7.      As a result and as will be discussed below, I submit that there is probable cause to believe that the Target Locations contain records and other evidence of the following offenses: (a) possession with intent to distribute and distribution of fentanyl, in violation of 21 U.S.C. § 841(a)(1); (b) use of a communications facility in the commission of controlled substances trafficking offenses, in violation of 21 U.S.C. § 843(b); and (c) conspiracy to possess with intent to distribute and to distribute fentanyl, in violation of 21 U.S.C. § 846 (collectively, the "Target Offenses").  More specifically, as will be discussed below, I submit that there is probable cause to believe that evidence of the Target Offenses, as set forth in Attachment C, will be located at the Target Locations, as described in Attachments A and B.

8.      In addition, I submit that there is probable cause to believe that LARA distributed and possessed with intent to distribute 40 grams or more of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vi), on July 2, 2019.

9.      I have personally participated in this investigation since May 2019.  I am familiar with the facts and circumstances of this investigation based upon: (a) my personal knowledge

and involvement in this investigation; (b) my review of records related to this investigation; (c) information provided to me orally and in writing by other law enforcement agents; and (d) my experience and training as a criminal investigator.

10.     Because this affidavit is submitted for the limited purpose of (1) establishing probable cause that evidence of criminal activity involving the Target Offenses is located at the Target Locations and (2) establishing probable cause to believe that LARA distributed and possessed with intent to distribute 40 grams or more of fentanyl on July 2, 2019, I have not included each and every fact known to me or other law enforcement officers involved in this investigation.  Rather, I have included only those facts that I believe are necessary to establish probable cause for the issuance of the requested search warrants and criminal complaint.

## **PROBABLE CAUSE**

### May 8, 2019: LARA sold 5 grams of suspected fentanyl to an undercover officer.

11.     On May 8, 2019, a confidential informant ("CI") informed investigators about a drug distributor known only as "Maestro." As discussed below, Maestro has been identified as LARA. This CI is fearful of retribution and is unwilling to testify at this time. The CI is a past reliable informant, who has worked with police in the past and the information received from the CI has assisted police with three prior drug distribution arrests. The CI is a drug user who has purchased drugs from LARA in the past. Based upon the corroboration detailed below, information received from the CI is believed to be reliable.

12.     On May 8, 2019, at the direction and under the supervision of investigators, the CI called LARA on his cell phone and ordered, "a bag," for $200. Based upon the CI's history with LARA, "a bag" referred to one bag of fentanyl. The CI also told LARA that the CI would

bring his/her cousin. An undercover police officer ("UC") accompanied the CI with the intention of being introduced as the CI's cousin.

13.     Prior to meeting LARA, investigators searched the CI for contraband with negative results. Investigators equipped the UC with an audio monitoring device and $200 of recorded police funds. This controlled purchase with LARA was not recorded. Thereafter, the CI and UC travelled to 1 Archstone Way in Tewksbury. At that location, the CI called LARA and stated that they were ready. Approximately 40 minutes later, investigators observed LARA arrive at 1 Archstone Way in a Jeep Grand Cherokee bearing Massachusetts registration 712DS8 (the "Jeep"). The CI and UC approached the driver's side of the Jeep. LARA then removed a bag of tan powdery substance from his mouth and handed it to the CI. Based upon my training and experience, drug distributors often secrete contraband in their mouths to avoid police detection. The CI then introduced the UC to LARA as his/her cousin. LARA instructed the CI to provide the UC with LARA's phone number so that the UC could contact LARA for future drug sales. The CI and UC then departed the area to a pre-determined location and provided other investigators with the bag of suspected fentanyl received from LARA. The bag weighed approximately 5.5 grams, including packaging. Based upon my training and experience, the packaging, appearance, and pricing, I believe that the substance provided by LARA contains fentanyl. Due to the airborne hazards of fentanyl, the substance was not field tested. The bag was later forwarded to the Massachusetts State Police Crime Laboratory, where analysis remains pending.

<u>Identification of LARA as "Maestro"</u>

14.     After the controlled purchase of suspected fentanyl on May 8, 2019, investigators queried the RMV database and learned that the Jeep was registered to Nancy Cruz Rojas at

Target Location #1. On May 9, 2019, investigators conducted surveillance of Target Location #1 and observed the Jeep parked outside Target Location #1. Upon a review of utility records, Nancy Cruz is the utilities subscriber at Target Location #1. Investigators also observed a white Honda Accord, bearing Massachusetts registration 43L570, (the "Accord") parked in the driveway of Target Location #1. Target Location #1 is a townhouse unit within a townhouse complex. The driveway mentioned is directly adjacent to Target Location #1. The Accord is registered to Milton LARA-Lara, at 4 Oakland Avenue, Methuen, Massachusetts. Investigators have observed no activity related to this investigation at the 4 Oakland Avenue address. Based upon my training and experience, drug traffickers often reside at residences and drive vehicles registered to significant others and/or relatives in order to avoid police detection. As further discussed below, based upon investigator's observations of LARA operating the Jeep, no observations of anyone else operating the Jeep, and LARA at Target Location #1 before and after a controlled purchase of fentanyl on June 13, 2019, I believe that LARA resides at Target Location #1.

15.     After searching the name, Milton LARA, in a police database, investigators learned that Milton LARA had an alias, Abner Rosado. A further query of Abner Rosado's criminal history revealed a booking photograph. Investigators separately showed the photograph of Abner Rosado to the CI and UC, both of whom positively identified him as the individual who sold them the bag of suspected fentanyl on May 8, 2019. A further query of Abner Rosado though law enforcement databases revealed two further aliases, Juan Arias Soto and Jamie Espinoza. Investigators then found Espinoza's photograph from his Massachusetts Identification Card. The photograph of Espinoza was also separately shown to the CI and UC, both of whom positively identified the individual depicted as the same individual that sold them the bag of

suspected fentanyl on May 8, 2019. Based upon my review, I believe that LARA has used the aliases Abner Rosado, Juan Arias Soto, and Jamie Espinoza.

May 16, 2019: LARA sold 10 grams of suspected fentanyl to the UC and then traveled to Target Location #2.

16.     On May 16, 2019, under the supervision of investigators, the UC called LARA on his cell phone and arranged to purchase 10 grams of fentanyl. Based upon the prior controlled purchase, investigators assumed the price was $400. This phone call was recorded. Prior to meeting LARA, the UC was equipped with an audio monitoring and recording device and $400 of recorded police funds. The recording of the controlled purchase is preserved. Thereafter, the UC travelled to 900 Ames Hill Drive in Tewksbury.

17.     Approximately 45 minutes after the UC arrived at 900 Ames Hill Drive, investigators observed the Jeep travel to 900 Ames Hill Drive and park in the parking lot. The UC then approached the driver's side of the Jeep. Outside the driver's side of the Jeep, the UC handed LARA the $400 of recorded funds. In return, LARA handed the UC a bag containing approximately 10 grams of suspected fentanyl. Thereafter, the UC departed the area. Later, the UC provided the bag of suspected fentanyl to investigators. Based upon my training and experience, the packaging, appearance, and pricing of the substance, I believe that the substance contains fentanyl. Due to the airborne hazards of fentanyl, the substance was not field tested. The substance was transported to the DEA Northeast Regional Laboratory for analysis, which remains pending.

18.     After the controlled purchase, investigators maintained surveillance of LARA in the Jeep. LARA traveled to a condominium building in Plaistow, New Hampshire. An unidentified female exited the building and entered the Jeep. LARA drove the Jeep around the

building, and the unidentified female exited the Jeep and re-entered the building, The Jeep then proceeded back towards Lawrence, Massachusetts. LARA drove to the building of Target Location #2 and parked outside the building. This observation was approximately 50 minutes after the controlled purchase with the UC. An investigator observed LARA exit the Jeep and walk between the building of Target Location #2 and a garage and continued out of view. Thereafter, surveillance was terminated.

GPS information about the Jeep and LARA's Accord demonstrate that he resides at Target Location #1.

19.     On May 31, 2019, investigators sought and obtained a GPS warrant for the Jeep. *See* 19-mj-1192-DLC. During the early morning hours of June 3, 2019, investigators installed the GPS device on the Jeep, which was parked outside Target Location #1. From the date of the installation until July 3, 2019, when the GPS device was removed, the Jeep was parked outside of Target Location #1 nearly every night during the overnight hours. Further, during the early morning hours of July 3, 2019, while investigators were removing the GPS device from the Jeep, investigators observed LARA's Honda Accord parked outside of Target Location #1. Based upon LARA's use of the Jeep, no one else observed operating the Jeep, his Honda Accord parked outside Target Location #1 during the early morning hours of July 3, 2019, and as discussed below, observations of LARA at Target Location #1 on June 13, 2019 before and after a controlled purchase of fentanyl, I believe that LARA resides at Target Location #1.

June 3, 2019: LARA departed from Target Location #2 and then sold 20 grams of suspected fentanyl to the UC.

20.     On June 3, 2019, under the supervision of investigators, the UC called LARA on his cell phone and arranged to purchase "two," meaning two fingers or 20 grams of fentanyl. The

8

UC and LARA agreed to meet at 900 Ames Hill Drive in Tewksbury. Based upon the prior controlled purchase, investigators assumed the price was $800. This phone call was recorded. Prior to meeting LARA, the UC was equipped with an audio monitoring and recording device and $800 of recorded police funds. The recording of this controlled purchase is preserved. Thereafter, the UC travelled to 900 Ames Hill Drive in Tewksbury.

21.     Investigators subsequently located LARA driving the Jeep and observed him drive to and park outside the building of Target Location #2. LARA exited the Jeep and approached the rear door of the building. For reasons discussed below, investigators believe that this rear door leads to the basement, Target Location #2. LARA utilized a set of keys to open the rear door and entered. After approximately 20 minutes, LARA exited Target Location #2 and proceeded to 900 Ames Hill Drive in Tewksbury.

22.     Approximately 15 minutes after LARA left Target Location #2, investigators observed the Jeep arrive and park in the parking lot of 900 Ames Hill Drive in Tewksbury. The UC then approached the passenger side of the Jeep. Outside the passenger side of the Jeep, the UC handed LARA the $800 of recorded funds. In return, LARA handed the UC a bag containing approximately 20 grams of suspected fentanyl. Thereafter, the UC entered 900 Ames Hill Drive and LARA departed the area. Later, the UC provided the bag of suspected fentanyl to investigators. Based upon my training and experience, the packaging, appearance, and pricing of the substance, I believe that the substance contains fentanyl. Due to the airborne hazards of fentanyl, the substance was not field tested. The substance was transported to the DEA Northeast Regional Laboratory for analysis, which remains pending.

June 13, 2019: LARA departed from Target Location #1, stopped briefly at Target Location #2, sold 35 grams of suspected fentanyl to the UC, and then returned to Target Location #1.

23.     On June 13, 2019, under the supervision of investigators, the UC called LARA on his cell phone and arranged to purchase 35 grams of fentanyl to be completed at the McDonald's Restaurant on Andover Street in Tewksbury. The UC negotiated the purchase price of the 35 grams of fentanyl to be $1,200. This phone call was recorded. Prior to meeting LARA, the UC was equipped with an audio monitoring and recording device and $1,200 of recorded police funds. The recording of the controlled purchase is preserved. Thereafter, the UC travelled to the McDonald's on Andover Street in Tewksbury.

24.     Prior to the UC's phone call to LARA, investigators observed the Jeep parked in the driveway of Target Location #1. After the phone call between the UC and LARA, investigators observed LARA depart Target Location #1 in the Jeep. LARA drove to the building of Target Location #2 and entered Target Location #2 through the rear door using a set of keys. Shortly thereafter, LARA left Target Location #2 and placed a blue object (possibly a backpack) into the Jeep. LARA then drove to the McDonald's on Andover Street in Tewksbury. LARA exited the Jeep and went into the McDonald's bathroom where he met with the UC. Inside the McDonald's bathroom, the UC handed LARA the $1,200 of recorded funds. In return, LARA handed the UC a bag containing approximately 35 grams of suspected fentanyl. Thereafter, the UC departed the McDonald's and left the area. LARA likewise exited the McDonald's and left the area. The GPS device on the Jeep indicated that the Jeep departed the McDonald's and proceeded directly to the area of Target Location #1. Later, the UC provided the bag of suspected fentanyl to investigators. Based upon my training and experience, the packaging, appearance, and pricing of the substance, I believe that the substance contains fentanyl. Due to the airborne hazards of fentanyl, the substance was not field tested. The substance was transported to the DEA Northeast Regional Laboratory for analysis, which remains pending.

**July 2, 2019: LARA departed from Target Location #2 and then sold 45 grams of suspected fentanyl to the UC.**

25.     On July 2, 2019, under the supervision of investigators, the UC called LARA on his cell phone and arranged to purchase 45 grams of fentanyl to be completed at the McDonald's Restaurant on Andover Street in Tewksbury. The UC negotiated the purchase price of the 45 grams of fentanyl to be $1,500. This phone call was recorded. Prior to meeting LARA, the UC was equipped with an audio monitoring and recording device and $1,500 of recorded police funds. The recording of the controlled purchase is preserved. Thereafter, the UC travelled to the McDonald's on Andover Street in Tewksbury.

26.     After the phone call setting up the controlled purchase, the UC received an unrecorded phone call from LARA stating that LARA was 15 minutes away from the meeting location. Around the time of this phone call, an investigator observed LARA's Accord arrive and park outside the building of Target Location #2. This investigator observed LARA and an unidentified female ("UF1") carrying clothing from the Accord to the rear of the building, continuing out of sight. Minutes later, investigators observed the Accord depart the area of Target Location #2 and proceed to the meeting location. LARA and UF1 exited the Accord and went into the McDonald's where LARA met with the UC. Inside the McDonald's bathroom, the UC handed LARA the $1,500 of recorded funds. In return, LARA handed the UC two bags containing approximately 45 grams of suspected fentanyl. Thereafter, the UC departed the McDonald's and left the area. LARA and UF1 likewise exited the McDonald's and left the area. Later, the UC provided the two bags of suspected fentanyl to investigators. Based upon my training and experience, the packaging, appearance, and pricing of the substance, I believe that the substance contains fentanyl. Due to the airborne hazards of fentanyl, the substance was not

field tested. The substance was transported to the DEA Northeast Regional Laboratory for analysis, which remains pending.

Information about Target Location #2

The residence at 631 Haverhill Street is a two-family residence. Based upon city assessor records, the two finished units within 631 Haverhill Street are on the first and second floor, respectively. The attic and basement are unfinished. The basement, Target Location #2, spans the entire area of the building, and is not subdivided. As mentioned above, investigators have observed LARA access Target Location #2 through the rear door of the building, using a set of keys. The rear door that leads to Target Location #2 is circled in red in Attachment B. *See* Photograph A. This rear door is set below the first floor windows. *See* Photograph B. Further, the first floor unit is accessible by ascending a set of stairs on the side of the building. See Photograph C. In contrast, the rear door is accessible from the ground. *See* Photograph B. Therefore, I believe that Target Location #2 is the basement of 631 Haverhill Street, Lawrence, Massachusetts, as described in Attachment B.

I have reviewed the ownership history and utility subscribers for 631 Haverhill Street, Lawrence, Massachusetts. No names that appear on either the ownership history or utility subscribers have any significance to this investigation. Since the basement is unfinished, no utility subscribers would be associated with Target Location #2. I believe that the defendant is using Target Location #2 to store narcotics, drug packaging material, drug proceeds, and/or records related to his drug distribution, as described in Attachment C.

**Drug Traffickers' Use of Residences and Cell Phones Generally**

27.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-

traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered during searches of drug-traffickers' residences and locations of operation:

a. Controlled substances.

b. Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics.

c. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

d. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

e. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

f. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

g. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

    h.   Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

    i.   Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on the phone, call logs, saved text messages, saved usernames and passwords and documents.

28.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.  I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

29.    Even when drug dealers store their drugs outside their residences, I know that they often will keep records relating to these offsite storage locations at their primary residence.  Such documents include rental or storage property agreements and receipts.

30.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for traffickers to conceal, at their residences or locations of operations, large sums of money, either proceeds from drug sales or monies to be used to purchase controlled substances.

31.     Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds.  Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals.  In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

32.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes or other containers so that other individuals who are at their residence do not discover these materials.

33.     During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the Target Offenses.  Such identification

evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.  Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping.  Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility.  For example, a person involved in the trade of illegal drug is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills.  These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

34.     Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators.  In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance.  Because cellular telephones are often a principal means of communication, drug dealers typically keep the phones in close proximity or at their residences. Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences. As a result, it is common to recover not only paper records pertaining to the use of a cellular

phone by drug dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug dealers' residences.

35.     Based upon my knowledge, training and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals.  These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities.  These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.  Based on my training and experience, I know that many cellular telephones have the capabilities described above.

36.     Seizure of devices containing this information will provide information relating to coconspirators and accomplices.  I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging.  I also know that persons who sell illegal drugs regularly keep records of their illegal activities.  These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and

money owed by customers or to suppliers, and lists of quantities and/or specific controlled

substances preferred by or ordered by specific customers.  Individuals engaged in drug

trafficking activities often take photographs of their closest confederates.  Records of drug

trafficking activities can be produced and maintained on paper in a tangible form and/or by

electronic means on a cellular telephone.  From my training and experience, and information

provided to me by other agents, I am aware that individuals commonly store records of the type

described in Attachment C on their cellular telephones.

      37.    Additionally, I know that many drug traffickers often use cellular telephones in

order to communicate quickly and economically with their suppliers and customers via the

internet.  I am also aware that individuals frequently use cellular telephones to create and store

records of their actions by communicating with others through e-mail, electronic messages, and

updates to online social-networking websites; keeping their calendars; arranging for travel;

storing pictures; researching topics related to drug trafficking; and accessing their bank,

financial, investment, utility, and other accounts online.  Additionally, many cellular phones

today have a GPS navigation device on the phone.  Examination of the GPS data on a cellular

phone can provide valuable evidence as to the locations where drug traffickers meet with

coconspirators, including their sources of supply, and can aid in identifying those individuals.

Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers

store drugs, maintain bank accounts, and conceal their drug proceeds.

      38.    Based upon my training and experience, and information provided to me by

others involved in the forensic examination of computers, I know that electronic data on cellular

telephones can be stored in a variety of methods, including, but not limited to, within the

memory of the cellular telephone; within volatile memory, such as RAM; or on removable

media, such as memory cards.  I also know that electronic data can often be recovered months or

even years after it has been written, downloaded, saved, deleted, or viewed locally or over the

internet.  This is true because:

a. Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b. Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

39. Based on the foregoing, I believe there is probable cause to believe that evidence

of the commission of the Target Offenses, more specifically, the items set forth in Attachment C,

will be found in the Target Locations, described in Attachments A and B.

## **CONCLUSION**

40. Based upon the evidence set forth above, as well as my knowledge, training and

experience, I submit that there is probable cause to believe that at the Target Locations, as

described in Attachments A and B, there exist evidence, fruits, and instrumentalities of drug

distribution activities as set forth in Attachment C.  Accordingly, I respectfully request that

search warrants be issued authorizing the searches of the Target Locations described in Attachments A and B for the items detailed in Attachment C.

41.     Based upon the evidence set forth above, as well as my training and experience, I submit that there is probable cause to believe that on or about July 2, 2019, Milton Elias LARA distributed and possessed with intent to distribute 40 grams or more of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vi).  Accordingly, I respectfully request that a criminal complaint charging Milton Elias LARA, a/k/a Abner Rosado, a/k/a Juan Arias Soto, a/k/a Jamie Espinoza, a/k/a "Maestro," with violations of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vi) be issued.

42.     Disclosure of the contents of the applications, affidavit, search warrants, and complaint could compromise and jeopardize this ongoing investigation.  For that reason, I request that the applications, affidavit, search warrants, and complaint be sealed until further order of the Court.

_____
MICHAEL A. LOGAN
Task Force Officer
Drug Enforcement Administration


SIGNED and SWORN to before me this day, July 9, 2019.

HONORABLE DAVID H. HENNESSY
Chief United States Magistrate Judge
District of Massachusetts

**ATTACHMENT A**
**(Location to be searched)**

### 601 LOWELL STREET, UNIT #6, METHUEN, MASSACHUSETTS

The property at 601 Lowell Street, Methuen, Massachusetts is a townhouse complex. Unit #6 has

gray siding and is accessible through a red front door, circled below in yellow. The number 6 is

affixed to the right side of the door. The driveway is depicted to the right of the residence.

Photographs of the property are attached.

 

**ATTACHMENT B**
**(Location to be searched)**

**631 HAVERHILL STREET, BASEMENT, LAWRENCE, MASSACHUSETTS**

The property at 631 Haverhill Street, Lawrence, Massachusetts is a two-family residence. It has

tan siding and the basement is accessible through the rear door, circled below in red.

Photographs of the property are attached.



Photograph A



Photograph B



Photograph C

# ATTACHMENT C

## (Items to be seized)

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances); 21 U.S.C. § 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense); and 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances) (collectively, the "Target Offenses") from January 2019 to present:

1.     Controlled substances, including fentanyl.

2.     Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

3.     Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

4.     Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

5.     Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

6.     Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal

telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

7.      Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

8.      Cellular telephones used by or belonging to Milton Elias LARA, a/k/a, Abner Rosado, a/k/a, Juan Arias Soto, a/k/a Jamie Espinoza, a/k/a "Maestro," , and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking located in the memory of any mobile telephone, including but not limited to:

   a.      Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

   b.      Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

   c.      Text messages both sent to and received by the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

   d.      Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   e.      GPS data;

   f.      Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

   g.      Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

h.     All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

i.     Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.